IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| LARRY BALCOM, an individual, by and through his guardian ad litem, Mary Barnes, and MARY BARNES,<br><br>        Plaintiffs,<br><br>        v.<br><br>CLINTON PETERSON and APRIL PETERSON, a married couple, FORECLOSURE HELP, L.L.C., an Idaho Limited Liability Company, and JOHN & JANE DOE 1-5,<br><br>        Defendants. | Case No. 3:23-cv-00528-SB<br><br>**FINDINGS AND RECOMMENDATION** |

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiffs Larry Balcom ("Balcom") and Mary Barnes ("Barnes") (together, "Plaintiffs") filed this action against, among others, Defendants Clinton and April Peterson and Foreclosure Help, LLC ("Foreclosure Help") (together with Mr. and Mrs. Peterson, "Defendants").[1] Plaintiffs assert claims against Defendants for violations of Oregon's Unlawful Trade Practices Act (the

---

[1] Balcom's sister, Barnes, is acting as Balcom's attorney-in-fact. (Am. Comp. ¶ 1, ECF No. 33.) In addition, the Court appointed Barnes to serve as Balcom's guardian ad litem. (ECF No. 60.)

PAGE 1 – FINDINGS AND RECOMMENDATION

"UTPA"), abuse of a vulnerable person under Oregon Revised Statute ("ORS") § 124.110, breach of fiduciary duty, constructive fraud/quiet title, piercing the corporate veil, and fraudulent transfer.

Pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), Defendants move to dismiss Plaintiffs' claim for abuse of a vulnerable person under ORS § 124.110.[2] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), and not all parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court recommends that the district judge deny Defendants' motion to dismiss.

## BACKGROUND

Balcom is a sixty-one-year-old Oregon resident who for many years has been "unable to manage his financial resources due to mental limitations," and "has always been highly vulnerable and susceptible to manipulation and bullying." (Am. Comp. ¶¶ 1, 10, 48.) Mr. and Mrs. Peterson are married residents of Idaho. (*Id.* ¶ 3.) Foreclosure Help is an Idaho limited liability company. (*Id.* ¶ 6.) Mr. and Mrs. Peterson ran and controlled Foreclosure Help before it was "dissolved or simply ceased its operations and transferred all its assets to others." (*Id.* ¶¶ 3-6, 39.)

///

---

[2] Plaintiffs agreed to replead their first claim under the UTPA. (Pls.' Resp. Defs.' Mot. Dismiss & Make More Definite & Certain ("Pls.' Resp.") at 13, ECF No. 44; *see also* Defs.' Mot. Dismiss & Make More Definite & Certain ("Defs.' Mot.") at 1, ECF No. 39.) During oral argument, Defendants also withdrew their motions to make Plaintiffs' third and fourth claims (breach of fiduciary duty and constructive fraud/quiet title) more definite and certain and to dismiss Plaintiffs' fifth claim (piercing the corporate veil), "in response to Plaintiffs' agreement to replead their fourth and fifth claims[.]" (ECF No. 58.) Defendants did not challenge Plaintiffs' sixth claim (fraudulent transfer). (*See* Defs.' Mot. at 2.) In light of these developments, the Court's analysis is limited to Defendants' motion to dismiss Plaintiffs' second claim (abuse of a vulnerable person) "on the ground that Plaintiffs have failed adequately to plead a taking of money or property under [ORS] § 124.110[.]" (*See* ECF No. 58, noting that Defendants did not withdraw this motion).

PAGE 2 – FINDINGS AND RECOMMENDATION

In 2017, Balcom's elderly parents purchased a residential property in Tigard, Oregon, "free of any mortgage or lien." (*Id.* ¶¶ 2, 11.) The following year, Balcom's parents moved to Colorado to live near Balcom's sister, Barnes. (*Id.* ¶ 12.) Before they moved, Balcom's parents transferred the property's title to Balcom for estate planning purposes. (*Id.*) Not long after Balcom's parents moved to Colorado, Balcom, who "relied completely on his mother to obtain housing, manage money, monitor spending . . . , and . . . ensure his financial well-being" and "only sought help and advice from his mother," fell victim to a long-running "gift card scam." (*Id.* ¶¶ 13, 48.) Balcom ended up losing approximately $100,000 as a result of the gift card scam. (*Id.* ¶ 13.)

In November 2020, Balcom's mother passed away. (*Id.* ¶ 14.) Balcom fell behind on his bills because of the ongoing gift card scam and absence of his mother's assistance. (*Id.* ¶ 15.) As a result, Balcom obtained $5,500 and $25,000 lines of credit and a $72,000 mortgage loan on the property. (*Id.*)

In early November 2021, about five months after Balcom obtained the loan, Balcom's lender sent Balcom a statement notifying him that he was three months past due on his payments and owed $1,288.24. (*Id.* ¶ 16.) Less than two weeks later, Balcom contacted Foreclosure Help for assistance in avoiding foreclosure. (*Id.* ¶ 17.) At that time, Foreclosure Help's now-defunct website stated that it had "over a decade" of experience "dedicated to helping homeowners avoid foreclosure . . . [and] STAY living in [their] home . . . [or] sell it for top dollar," Balcom was "scared and thought [that] his only option was to sell the property." (*Id.* ¶¶ 17-18.) Balcom's property, which now has a "current market value of up to $450,000," had an estimated value of $340,000 in November 2021. (*Id.* ¶ 19.)

///

PAGE 3 – FINDINGS AND RECOMMENDATION

On November 18, 2021, six days after Balcom contacted Foreclosure Help, Defendants offered to buy Balcom's property "for the amount of [Balcom's] debt and closing costs," and informed Balcom that "he could lease the property for $300 a month for the first year, but then the rent would be raised to market value." (*Id.* ¶¶ 17, 21.) The next day, November 19, 2021, Defendants instructed Balcom how to use the Zoom video platform and Balcom walked "Defendants around the property using the software so they could inspect the property." (*Id.* ¶ 22.)

After the inspection, Defendants prepared a Purchase and Sale Agreement dated November 19, 2021. (*Id.* ¶ 23; *id.* Ex. B at 1-2.) The Purchase and Sale Agreement defined Balcom as the "Seller" and Foreclosure Help as the "Buyer" and provided that "[c]losing was set for November 20, 2021," the "total purchase price was $73,800, [i.e.,] the $72,500 mortgage plus the $1,300 past due that [Balcom] owed to [his lender]," and "[u]nless this offer is signed by Seller and personally received by Buyer, by [7:00 a.m. on November 20, 2021], the offer shall be deemed revoked and [any] deposit shall be returned." (*Id.* ¶ 23; *id.* Ex. B at 1.) Balcom did not sign the Purchase and Sale Agreement until November 24, 2021, the same day that Mr. Peterson signed the Purchase and Sale Agreement on Foreclosure Help's behalf. (*Id.* ¶ 23; *id.* Ex. B at 1-2.)

Before Balcom, Mr. Peterson, and Foreclosure Help signed the Purchase and Sale Agreement, Mr. Peterson (acting on Foreclosure Help's behalf) and Balcom signed a Residential Rental Agreement on November 19 and November 20, 2021, respectively. (*Id.* ¶ 24; *id.* Ex. C at 1-9.) The Residential Rental Agreement, which was dated November 19, 2021 and defined Foreclosure Help as the property's "Owner/Landlord" and Balcom as the "Tenant," provided that Balcom would pay $300 per month in rent and Balcom's lease would expire on November 30,

PAGE 4 – FINDINGS AND RECOMMENDATION

2022. (*Id.* Ex. C at 1.) The Residential Rental Agreement also included a provision stating that "[a]ll parties that have signed this Agreement release and forever discharge [Mr.] Peterson, [Mrs.] Peterson, and Foreclosure Help . . . from all actions, proceedings, claims, damages, costs, demands, court orders and legal fees that may arise from utilizing the provided contracts." (*Id.* Ex. C at 3.)

Balcom signed three other documents on November 20, 2021: an Authorization to Release Information, Special Power of Attorney, and Statutory Warranty Deed. (*Id.* ¶¶ 24-26; *id.* Ex. D at 1; *id.* Ex. E at 1-6; *id.* Ex. F at 1-3.) The Authorization to Release Information indicated that Balcom was providing his "written permission [for the recipient] to release [his property-related] Account Statement, payoffs and other information regarding the referenced account to [Mr.] Peterson, [Mrs.] Peterson, Kim Bailey, Foreclosure Help[,] and all associates[.]" (*Id.* Ex. D at 1; *id.* ¶ 24.)

The Special Power of Attorney, which stated that it "shall become effective immediately . . . [and] continue effective until [Balcom's] death or until [Balcom] lack[ed] sufficient mental competence to understand and handle [his] financial and personal affairs," appointed Mr. Peterson as Balcom's attorney-in-fact. (*Id.* Ex. E at 1, 3.) The Special Power of Attorney authorized Mr. Peterson to (1) act on Balcom's behalf with respect to real estate, (2) sell, convey, mortgage, or encumber Balcom's interest in the Tigard property, (3) "[m]anage, insure, improve, repair, collect rents, execute leases, or take any other action that a landlord might take," and (4) sell or convey any personal property that Balcom "might own now or in the future, tangible or intangible, on such terms and conditions as [Mr. Peterson] deem[ed] appropriate." (*Id.* Ex. E at 1-2; *id.* ¶ 25.) The Special Power of Attorney added that Mr. Peterson was entitled to "reasonable compensation for any services provided" and "reimbursement of all

PAGE 5 – FINDINGS AND RECOMMENDATION

reasonable expenses incurred as a result of carrying out any provision of this [appointment]." (*Id.* at 2.)

The Special Power of Attorney included a "Notice to Person Executing Power of Attorney" and "Notice to Person Accepting the Appointment as Attorney-in-Fact." (*Id.* Ex. E at 4-6.) Mr. Peterson signed the latter notice on November 22, 2021. (*Id.* Ex. E at 6.) This notice provided that "[b]y acting or agreeing to act as [Balcom's] Agent (attorney-in-fact) under this Power of Attorney, [Mr. Peterson] assume[d] the fiduciary and other legal responsibility of an Agent," including the "legal duty to[] act solely in the interest of the principal . . . and avoid conflicts of interest." (*Id.* Ex. E at 5.) Mr. Peterson also acknowledged that he "may be held responsible and liable for any intentional actions which violate[d] or abuse[d] [his] authority under this Power of Attorney as provided by the state and federal laws governing th[e] Power of Attorney." (*Id.*)

The Statutory Warranty Deed reflected that Balcom conveyed and warranted his property to Foreclosure Help "free of encumbrances, except as specifically set forth [t]herein," and that Balcom received "$10.00" as "true consideration for th[e] conveyance" of the property. (*Id.* Ex. F at 1; *id.* ¶ 26.)

On January 19, 2022, about two months after he signed the documents described above, Balcom called Mrs. Peterson, who was Balcom's "primary contact" at Foreclosure Help, to "inquire about buying a new condominium." (*Id.* ¶¶ 27, 39.) Balcom also called and asked to be put back on the property's title in late January 2022 and for a loan in early February 2022. (*Id.* ¶ 27.)

On March 3, 2022, Balcom received verification from Idaho Central Credit Union that Mr. Peterson transferred the $71,697.30 necessary to pay off the balance on Balcom's mortgage

PAGE 6 – FINDINGS AND RECOMMENDATION

loan. (*Id.* ¶ 28.) Five months later, on August 18, 2022, Mr. Peterson signed a quit-claim deed on Foreclosure Help's behalf, which conveyed the property to Mr. Peterson in exchange for "$1.00." (*Id.* ¶ 29.) Three months later, on October 17, 2022, Mr. Peterson, with assistance from Mrs. Peterson, obtained a $288,000 line of credit secured by a trust deed on the property. (*Id.* ¶ 30.)

On November 3, 2022, about four weeks before the lease expiration date set forth in the Residential Rental Agreement, Defendants sent Balcom a notice stating that he "needed to agree to a rental increase from $300 to $2,200 . . . or find another place to live by December [2022]." (*Id.* ¶ 31; *id.* Ex. G at 1.) Mrs. Peterson signed the notice in her purported capacity as a landlord. (*Id.*)

Around the same time, Defendants contacted individuals in Oregon, including a landlord from Lake Oswego, regarding their efforts to find a rental location where they could move Balcom. (*Id.* ¶¶ 34-35.) After meeting with Balcom and learning that the person who contacted him had falsely represented that she was Balcom's "niece," the landlord "became extremely concerned for [Balcom's] wellbeing and believed [that Balcom] was the victim of . . . fraud." (*Id.* ¶ 35.) Although Balcom was embarrassed and did not want to involve his family, the landlord used a social media network to track down and inform Balcom's sister, Barnes, about the situation. (*Id.*)

In December 2022, Barnes "piece[d] together what [had] happen[ed]" based on her conversations with the landlord and Balcom. (*Id.* ¶ 36.) Balcom believed that he immediately had to vacate the property and told Barnes that Defendants had found him a $500 per month trailer rental, storage facility for personal belongings, and moving truck, but Barnes convinced Balcom to stay in the property and stop communicating with and block calls from Defendants. (*Id.*)

PAGE 7 – FINDINGS AND RECOMMENDATION

In late December 2022, a lawyer who no longer represents Defendants notified Balcom that his rent was two months past due. (*Id.* ¶ 37.) The lawyer filed but "quickly dropped" an eviction proceeding against Balcom. (*Id.*) In early February 2023, a different lawyer, who also no longer represents Defendants, called and informed Balcom that "Defendants were willing to waive the late charge for the four months [Balcom] owed in rent and pay moving fees for [Balcom's] relocation, but that [Defendants'] next steps were to initiate eviction proceedings." (*Id.* ¶ 38.)

Two months later, on April 10, 2023, Plaintiffs filed the present action against Defendants.

## DISCUSSION

Pursuant to Rule 12(b)(6), Defendants move to dismiss Plaintiffs' claim for financial abuse of a vulnerable person in violation of ORS § 124.110. (Defs.' Mot. at 2; *see also* ECF No. 58, noting that Defendants did not withdraw their motion to dismiss on this ground). For the reasons explained below, the Court recommends that the district judge deny Defendants' motion to dismiss.

### I.    TIMELINESS

Plaintiffs argue that Defendants' Rule 12(b)(6) motion is untimely. (Pls.' Resp. at 2, 6-8.) The Court agrees.

Defendants filed their Rule 12(b)(6) motion after filing their answer and amended answer to Plaintiff's original complaint, which included Plaintiffs' claim for abuse of a vulnerable person under ORS § 124.110. (*See* Compl. ¶¶ 46-50, ECF No. 1; Answer, Affirmative Defs., & Countercl. ¶¶ 46-50, ECF No. 8; Am. Answer, Affirmative Defs., & Countercls. ¶¶ 46-50, ECF No. 17; Defs.' Mot. at 2-6, 8-9.) Courts have consistently recognized that such post-answer Rule 12(b)(6) motions are untimely.

PAGE 8 – FINDINGS AND RECOMMENDATION

For example, in *Barber v. Select Rehabilitation, LLC*, No. 3:18-cv-01235-SB, 2019 WL 2635593, at *2 n.1 (D. Or. Feb. 8, 2019), *findings and recommendation adopted¸* 2019 WL 2028519, at *1-2 (D. Or. May 8, 2019), this Court addressed a motion for leave to file an amended complaint, and in doing so, agreed with the plaintiff that the defendant could not "now challenge the sufficiency of allegations that also appeared in [the plaintiff's] original complaint," because "[a]ny motion asserting a 12(b) defense must be made before filing an answer." *Id.* (quoting *Brooks v. Caswell*, No. 3:14-cv-01232-AC, 2016 WL 866303, at *2 (D. Or. Mar. 2, 2016)). The Court added that "[a]fter declining to file a pre-answer motion, [the defendant] may raise a failure to state a claim defense only in a pleading allowed under Rule 7(a), 'by a motion under Rule 12(c), or at trial.'" *Id.* (quoting FED. R. CIV. P. 12(h)(2) and citing *Brooks*¸ 2016 WL 866303, at *4).

Similarly, in *Brooks*, the district court explained that the "[d]efendants answered the Initial Complaint not once, but three times," and "then filed [a] Motion to Dismiss, quite plainly in violation of Rule 12(b)." 2016 WL 866303, at *3. The district court therefore denied the defendants' motion on the ground that it was untimely. *Id.* In support of its decision, the district court noted that "[a]llowing a post-answer motion to dismiss . . . an amended complaint where the amendment merely substantiate[d] existing claims would render the Rule 12(b) restriction on post-answer motions meaningless," and it preferred to "follow[] many other circuits and district courts across the country which have held that an amended complaint does not revive the right to file a post-answer motion to dismiss, with the exception that new claims may be attacked." *Id.* The district court added that "the key issue [was] not the substance of the defense asserted, but rather how it [was] asserted," and the defendants' assertion of "a failure to state a claim defense

PAGE 9 – FINDINGS AND RECOMMENDATION

in their initial answer neither preserved nor resurrect[ed] their right to file a post-answer motion to dismiss." *Id.* at *4.

Plaintiffs cite *Barber* and *Brooks* in support of their argument that Defendants' post-answer Rule 12(b)(6) motion is improper and therefore should be denied. (*See* Pls.' Resp. at 6, 8.) The Court agrees that *Barber* and *Brooks* are persuasive and support denying Defendants' Rule 12(b)(6) motion. Plaintiffs' filing of an amended complaint did not revive Defendants' right to file a post-answer motion to dismiss because Plaintiffs' amended complaint did "not substantively change the claim." (*Id.* at 2.) Defendants do not dispute this point and appear to acknowledge that *Barber* and *Brooks* support Plaintiffs' position that the Court should deny Defendants' motion as untimely. (*See* Defs.' Reply Supp. Mot. Dismiss & Make More Definite & Certain ("Defs.' Reply") at 2 & n.1, ECF No. 51, stating that "Plaintiffs are correct" and citing *Brooks* and "decisions by [this Court]").

Consistent with these observations and *Barber* and *Brooks*, the Court recommends that the district judge deny Defendants' post-answer Rule 12(b)(6) motion on the ground that it is untimely.

II.    **JUDICIAL ECONOMY**

Defendants note that "it is not without precedent for a court to dismiss a claim under [Rule] 12(b)(6) after an answer is filed but before the pleadings are closed based on judicial economy," and argue that the Court should do the same here. (Defs.' Reply at 2, citing *Miller v. Fuhu Inc.*, No. 14-06119, 2015 WL 2085490, at *7 (C.D. Cal. May 4, 2015).)

In *Brooks*, the defendants similarly "point[ed] out [that] at least three district courts ha[d] . . . exercised their discretion and entertained untimely post-answer motions to dismiss . . . amended complaints for the sake of judicial economy." 2016 WL 866303, at *4 (citing, *inter alia*, *Miller*, 2015 WL 2085490, at *6). The district court explained that "with both

PAGE 10 – FINDINGS AND RECOMMENDATION

the procedural posture and equitable considerations of th[e] case in mind, evaluating the merits of the [defendants'] [m]otion cut[] against judicial economy [t]here." *Id.* In support of this finding, the district court emphasized, among other things, that (1) the "parties ha[d] continued to mount procedural sieges against one another, most of which ha[d] failed to result in meaningful progress," (2) the "[d]efendants had ample opportunity to move to dismiss the Initial Complaint, which they did not do," (3) the "[d]efendants [were] not without recourse" because the "defense of failure to state a claim cannot be waived," and (4) "though judgment on the pleadings under Rule 12(c) [was] not available since [the] [d]efendants ha[d] not yet filed an answer to the Amended Complaint, and hence the pleadings [were] not yet closed, [the] [d]efendants [were] free to assert the defense of failure to state a claim in their answer to the Amended Complaint, in a subsequent 12(c) motion for judgment on the pleadings, or at trial." *Id.* (citing FED. R. CIV. P. 12(h)(2)). The district court added that the "[m]otion raise[d] multiple fact issues which would be best addressed on a summary judgment motion, if any further motion practice . . . [was] contemplated." *Id.* at *4 n.1.

   Like *Brooks*, the Court finds it inappropriate to entertain Defendants' untimely Rule 12(b)(6) motion for the sake of judicial economy. Although the parties have filed numerous motions and requested and received multiple discovery and motion hearings since Plaintiffs filed this case on April 10, 2023, the parties have failed to make meaningful progress in this litigation. Further, Defendants had ample opportunity to move to dismiss Plaintiffs' ORS § 124.110 claim before filing their answers but elected not to do so until late November 2023. (*See* ECF No. 7, extending Defendants' answer deadline from May 17, 2023 to June 12, 2023; ECF Nos. 15-17, allowing Defendants to amend their answer and counterclaims on August 2, 2023). Additionally,

PAGE 11 – FINDINGS AND RECOMMENDATION

Defendants are not without recourse, as they remain able to raise the defense under Rule 12(c) or at trial, or file a Rule 56 motion.

For these reasons, the Court recommends that the district judge deny Defendants' motion to dismiss.

## CONCLUSION

For the reasons stated, the Court recommends that the district judge DENY Defendants' motion to dismiss (ECF No. 39).

## SCHEDULING ORDER

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 16th day of February, 2024.

*Stacie F. Beckerman*
HON. STACIE F. BECKERMAN
United States Magistrate Judge